Kent A. Higgins
khiggins@merrillandmerrill.com
Idaho State Bar #3025
**MERRILL & MERRILL, CHARTERED**
109 North Arthur - 5th Floor
P.O. Box 991
Pocatello, ID 83204-0991
(208) 232-2286
(208) 232-2499 Telefax
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TOM JOHANSEN and SANDY JOHANSEN; BRETT ANDERSEN and MISTY ANDERSEN, in their individual capacities and as natural guardian for B.A.; JOHN JOHANSEN; JAMI JOHANSEN; and MARIE JOHANSEN<br><br>Plaintiffs,<br><br>vs.<br><br>NORANDA MINING INC., NORANDA EXPLORATION, INC., POLYONE CORPORATION, ALUMET CORPORATION, BLACKBIRD MINING COMPANY, a Limited Partnership, INTALCO ALUMINUM CORPORATION, PECHINEY S.A. (n/k/a Alcan France S.A.S.), PECHINEY CORPORATION (n/k/a Howmet Holdings Corporation), and PECHINEY METALS, LLC,<br>    Defendants. | Case No.: 4:10-cv-00257-BLW<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, Tom Johansen and Sandy Johansen; Brett Andersen and Misty Andersen, in their individual capacities and as natural guardians for B. A.; John Johansen; Jami Johansen; and Marie Johansen.

## JURISDICTION AND VENUE

1. This court has original jurisdiction under 28 U.S.C. §1332 in that all the Defendants are out-of-state corporations or other business entities with their principal places of business out-of-state, and the amount in controversy exceeds $75,000.00.

2. Venue lies in the District Court of Idaho pursuant to 28 U.S.C. §1391(b)(2) in that part of the events or omissions giving rise to the claim occurred within the Judicial District.

## PARTIES

3. Plaintiffs Tom and Sandy Johansen are residents of Bannock County, Idaho, and previous owners of property known as Panther Creek Inn located on Panther Creek in Lemhi County, Idaho. Brett and Misty Andersen are residents of Bannock County, Idaho, and previous managers and residents of Panther Creek Inn in Lemhi County, Idaho. B.A. Andersen is the minor son of Brett and Misty Andersen and is a resident of Bannock County, Idaho, who resided with his parents at the Panther Creek Inn. John Johansen is a resident of Bannock County, Idaho. Jami Johansen is a resident of Jefferson County, Idaho. Marie Johansen is a resident of Bannock County, Idaho. John, Jamie and Marie are children of Tom and Sandy Johansen who spent significant time residing, working or visiting with their parents at the Panther Creek Inn.

4. Defendant Noranda Mining Inc., is an out-of-state (Delaware) corporation, registered to do business in the State of Idaho and in good standing. Noranda Mining, Inc. is a General Partner of the Blackbird Mining Company, a Limited Partnership.[1] Noranda Mining Inc. along with Noranda Exploration, Inc. Hannah Mining, and Blackbird Mining Company own the majority of the unpatented mining claims and private land that is refereed to in this complaint as the Blackbird Mine Site. On information and belief, Noranda Mining Inc., as General Partner of the Blackbird Mining

---

[1] Although Blackbird Mining Company designates itself as a Limited Partnership, plaintiffs are unable to locate confirmation that proper organizational documents exist to confirm its limited partnership existence, thus it may be a general partnership comprised of .

Company., a Limited Partnership, assumes and guarantees the obligations, if any, of the M.A. Hanna Company and Hanna Services Company to perform Response Actions relating to the Blackbird Mine Site by virtue of a consent decree entered into with the United States and the State of Idaho in *State of Idaho, et al., v. The M.A. Hanna Company, et al.*, CV 83-4179(R) dated 04/28/1995. Noranda Mining Inc. is among those entities charged by a Unilateral Administrative Order for Remedial Design and Remedial Action of the United States Environmental Protection Agency, (U.S. Docket No. CERCLA-10-2003-0112, Noranda Exploration, Noranda Mining, Inc., Alumet, Intalco Aluminum Corporation, M.A. Hanna Company and Rojet enterprises, Rexpondents), with the duty to perform both a cobalt toxicity study, and the collection and treatment of discharges from the West Fork Tailing Impoundment. Defendant Noranda Mining Inc. was also obligated by the same Order to fulfill cleanup actions that would meet the Performance Standards set forth in the remedy described in the United States Environmental Protection Agency Record of Decision for the Blackbird Mine Site executed on March 3, 2003. (Record of Decision).

5. Defendant Noranda Exploration, Inc., is an out-of-state (Delaware) corporation registered to do business in the State of Idaho and in good standing. Noranda Exploration, Inc. is among those entities charged by a Unilateral Administrative Order of the United States Environmental Protection Agency with the duty to perform both a cobalt toxicity study, and the collection and treatment of discharges from the West Fork Tailing Impoundment. Defendant Noranda Exploration, Inc. was also obligated by the same Order to cleanup actions that would meet the Performance Standards set forth in the remedy described in the Record of Decision.

6. Polyone Corporation, formerly M.A. Hanna Company is a Delaware Corporation, with its principal place of business in the State of Ohio, Polyone Corporation is the successor to Rojet Enterprises, which is the successor to Hanna Services Company. Rojet Enterprises and M.A. Hanna Company are among those entities charged by a Unilateral Administrative Order, with the duty to perform both a cobalt toxicity study, and the collection and treatment of discharges from the West Fork Tailing Impoundment. Rojet Enterprises and M.A. Hanna Company were also obligated by the same Order to cleanup actions that would meet the Performance Standards set forth in the remedy described in the Record of Decision.

7. Alumet Corporation is, or was, a wholly owned subsidiary of Alumax . Alumet is among those entities charged by a Unilateral Administrative Order with the duty to perform both a cobalt toxicity study, and the collection and treatment of discharges from the West Fork Tailing Impoundment. Defendant Alumet was also obligated by the same Order to cleanup actions that would meet the Performance Standards set forth in the remedy described in the Record of Decision.

8. Defendant "Blackbird Mining Company, a limited partnership," is a name given for an unregistered business entity in one or more settlement documents pertaining to the Blackbird Mine Site. Blackbird Mining Company, a limited partnership, is not registered to do business in the State of Idaho, nor does it appear to have any of the formalities of partnership existence registered in any other state. If and to the extent it does exist as a limited partnership, Plaintiffs allege on information and belief, that Noranda Mining, Inc. is a General Partner of the Blackbird Mining Company, a Limited Partnership. Noranda Mining Inc., is an out-of-state (Delaware) corporation, registered to do business in the State of Idaho and in good standing. On information and belief, the other partner is Noranda Blackbird Corporation, a Delaware Corporation.

9. Intalco Aluminum Corporation (formerly Alumet Corporation) is a Delaware Corporation with its principal place of business in the State of Washington and is not registered or licensed to do business in the State of Idaho. Intalco Aluminum Corporation is among those entities charged by a Unilateral Administrative Order with the duty to perform both a cobalt toxicity study, and the collection and treatment of discharges from the West Fork Tailing Impoundment. Defendant Intalco Aluminum Corporation was also obligated by the same Order to cleanup actions that would meet the Performance Standards set forth in the remedy described in the Record of Decision.

10. Pechiney S.A. (now known as Alcan France S.A.S.) is a French simplified stock company with its home office in Paris, France. Pechiney S.A. was at one time an owner of record of the Blackbird Mine, and Pechiney S.A.'s actions during ownership contributed to the contamination of the Blackbird Mine Site that is the subject of this lawsuit.

11. Pechiney Corporation (now known as Howmet Holdings Corporation) is a Delaware corporation with its principal place of business in Michigan. Pechiney Corporation was, at one time, an affiliate of Pechiney S.A., and in this capacity became a successor in interest to the Blackbird

Mine. During Pechiney Corporation's ownership of the Blackbird Mine, it contributed to the contamination of the Blackbird Mine Site that is the subject of this lawsuit. In 2008, the EPA listed Pechiney Corporation as a potentially responsible party in the EPA's First Five-Year Review Report for the Blackbird Mine Site.

12. Pechiney Metals, LLC (formerly Pechiney Metals Corporation) is a Delaware limited liability Company with its principal place of business in Illinois. Pechiney Metals, LLC was, at one time, a subsidiary and/or affiliate of Pechiney S.A. As part of this relationship, Pechiney Metals, LLC established an escrow account to fund cleanup actions related to the Blackbird Mine Site, which clean-up actions were pursuant to a 1995 Consent Order, described in detail below, and subsequent EPA orders. Pechiney Metals, LLC, has purposefully availed itself to the privilege of conducting activities in Idaho by consummating a settlement with the Plaintiffs in Idaho in 2009. Upon information and belief, Pechiney Metals, LLC is also funding the ongoing responsibilities and obligations of Pechiney S.A. and/or Pechiney Corporation related to the Blackbird Mine Site, including, but not limited to, issuing checks to Plaintiff Misty Andersen in relation to the Blackbird Mine Site.

13. Upon information and belief, the responsibilities of Pechiney S.A., Pechiney Corporation, and Pechiney Metals, LLC as they relate to the Blackbird Mine Site are interconnected.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

14. The Blackbird Mine Site is an inactive mine located in Lemhi County, Idaho, approximately 13 miles south of the Salmon River and 25 miles west of Salmon, Idaho. The Blackbird Mine Site encompasses approximately 830 acres of private, patented mining claims and 10,000 acres of unpatented claims within the Salmon - Challis National Forest and some privately owned residential properties along Panther Creek. The mine is situated on a large copper and cobalt deposit. For purposes of this complaint, the "Blackbird Mine Site" or "The Site" shall mean, all private lands, land subject to unpatented mining claims, and federal lands where waste rock, tailings, and other contaminants generated from the Blackbird Mine ( the Mine) have come to be located. The site includes the beds and banks of Blackbird, West Fork of Blackbird, Meadow, Bucktail, South

Fork of Big Deer, Big Deer, and Panther Creeks, in those portions of the Creeks where hazardous substances released from the Mine have come to be located.

15. Since the late 1880's several companies have mined cobalt and copper and gold, on the site with both mine tunnels and open pit methods, resulting in about 14 miles of underground workings, a 12 acre open pit, 4.8 million tons of waste rock deposited in numerous piles, and 2 million tons of tailings disposed of at the West Fork Tailings Impoundment

16. The current owner, the Noranda Mining Company, ceased active mining operations in 1982.

17. Located on the West Fork of Blackbird Creek is a tailings impoundment containing approximately four million cubic yards of tailings, and other tailing deposits are located along Blackbird Creek from transport of the tailings to the West Fork Tailings Impoundment.

18. Mine tunnels, waste drop piles and the open pit are located at the headwaters of Meadow and Bucktail Creeks which drain into Big Deer and Blackbird Creeks, and from Blackbird Creek into Panther Creek.

19. Investigations have shown that acid rock, drainage and leachat from the tunnels, waste piles, and tailings have contributed to the poor water quality in the local creeks. As a consequence, hazardous concentrations of heavy metals and contaminants such as copper, cobalt and arsenic are or were present in surface water and/or sediments downstream from the site in quantities that pose an unacceptable human health risk.

20. Waste rock from historic mining activities have been the largest source of contamination of surface water and ground water at the Blackbird Mine Site.

21. Draining from the waste rock piles, the underground workings and the Bucktail Pit, tailings, deposited along Blackbird Creek and the West Fork Tailings Impoundment have resulted in the release of elevated concentrations of hazardous substances; as such is defined under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and /or pollutants or contaminants under section 101(33), 42 U.S.C. § 9601(33) and /or hazardous waste, as such is defined by Idaho Code § 39-4403(8), to the ground water, surface water, and soils; including, but not limited to, one or more or all of cobalt, arsenic and copper, cadmium, manganese, and nickel.

22. In 1983 the Idaho Attorney General filed a natural resources damages suit against current and two previous site owners/operators for alleged damages to state surface water and ground water. The suit was settled in 1995.

23. In 1995, a Consent Decree was entered into with Defendants or their predecessors as the potentially responsible parties, to address the United States' and the State of Idaho's natural resource damage claims. Pursuant to Administrative Orders on Consent, Defendants or their predecessors have conducted response action to reduce the potential for mass failure of the tailings storage, and to remove contaminants to mitigate risks to human health and the environment. The defendants, their predecessors, successors, assigns, subsidiaries, divisions groups, affiliates, partnerships, joint ventures, and their directors, officers, managers, agents and employees who were charged with, or who have undertaken cleanup activities at the Blackbird Mine Site are collectively referred to in this complaint as "BMSG"

24. A number of cleanup actions were performed under CERCLA (the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq). between 1993 and 2001 prior to selection of the final remedial action in the Record of Decision.

25. Cleanup efforts have focused upon collecting contaminated water running off of sources in the mining area.

26. Until and including the summer of 2009, the closest permanent dwelling site to the Blackbird Mine site was the Panther Creek Inn, a tavern located approximately five miles southeast mine at the confluence of Blackbird and Panther Creeks.

27. Until September, 2009, the Panther Creek Inn was owned, operated, occupied, and/or managed by the Plaintiffs. The Inn has been occupied year round at least since 1980.

28. Investigations conducted in the past of the Panther Creek Inn property identified elevated concentrations of arsenic in soils to the point that the concentrations surpass acceptable levels and pose an unacceptable risk to human health.

29. The contaminated soils were supposed to be have removed by BMSG to a minimum depth of one foot and replaced with clean fill. However, the removal efforts were ineptly and

inadequately completed. Until the summer of 2008, Plaintiffs were not informed that clean-up of contamination by BMSG in previous years had not included cleanup of soils around trees and shrubs on the Panther Creek Inn property. Subsequent testing in July of 2008 showed a substantial amount of contamination still remained on the property of Panther Creek Inn from previous years' contamination. It was also in July 2008, that BMSG and the Idaho Department of Environmental Quality tested for the first time the sediments for heavy metal contamination.

30. The removal action of contaminated soils on the properties of the Panther Creek Inn also included construction of three settlement (or sediment) ponds along Blackbird Creek, two of which were just above (and actually trespassing onto) the Panther Creek Inn property, and removal of contaminated overbank deposits that are susceptible to erosion along Blackbird Creek.

31. Defendants, or their agents, jeopardized the settlement ponds by tampering with Blackbird Creek in a manner that removed many of the meanderings between the West Fork Tailing Impoundment and the settlement ponds thereby increasing the velocity of water flow through Blackbird Creek and into the sediment ponds.

32. Although warned that the design of the settlement ponds, coupled with the modification of Blackbird Creek, was unworkable, Defendants pursued this solution because it was the more economical. Defendants consciously chose to "roll the dice", and take their chances, thereby jeopardizing public health by knowingly exposing plaintiffs and their property to dangerous levels of cobalt, arsenic and other heavy metals and hazardous substances.

33. Although Defendants have periodically cleaned the contaminant ponds built above Panther Creek, Defendants have trucked the sludge, from the ponds and from the Blackbird Mine Site, in dump trucks, and the watery, contaminant laden sludge has splashed or leaked out of the rear of the dump trucks depositing toxic levels of contaminated sludge along the roadway as the vehicles driven down the Panther Creek Road. Subsequent vehicles traveling the contaminant-laden Panther Creek Road stirred the contaminant laden dust, creating airborne pollution that infiltrated the surrounding property, including the Panther Creek Inn and other structures on the Panther Creek Property. The contaminant-laden dump trucks, as well as other vehicles belonging to BMSG and BMSG employees and agents, frequented the Panther Creek Inn on a regular basis. The vehicles

would park at the Panther Creek Inn. The drivers and other agents of defendants would track in the contaminated soils into the Panther Creek Inn. The contaminated sludge would drip out of or fall off of the trucks and other vehicles belonging to BMSG.

34. On or about May 20, 2008, after the spring runoff, the settlement ponds failed, flooding the streambanks and properties down Panther Creek, including the Property of the Panther Creek Inn.

35. Again, In the spring of 2009 high water in Blackbird Creek washed out the settlement ponds mobilized the contaminated sediments, redepositing them along the banks of Panther Creek, particularly on the properties of the Panther Creek Inn. The sediment contained toxic levels of arsenic and heavy metals at levels that posed a potential human health risk to Plaintiffs.

36. The major contaminants from the Blackbird Mine Site are arsenic, copper and cobalt. Arsenic is poison. Chronic exposure to and the ingestion of arsenic or cobalt is particularly dangerous to young children. Arsenic exposure may result in weakness, anorexia, GI irritability, cognitive impairment, peripheral neuropathy, skin disorders, hypertension, atherosclerosis such as that demonstrated by loss of circulation in the extremities (blackfoot disease). Developmental defects are suspected (low birth weight, congenital malformations) in mothers who exhibited significant maternal toxicity. Chronic arsenic exposure may cause cancer of the skin and/or lungs, and possibly of the liver, kidney, and bladder. Further, in discrete populations that have had chronic exposures to arsenic, an association with cardiovascular disease including hypertension has been identified. Ingesting very high levels of arsenic can result in death. Exposure to lower levels can cause nausea and vomiting, decreased production of red and white blood cells, abnormal heart rhythm, damage to blood vessels, and a sensation of "pins and needles" in hands and feet. Ingesting or breathing low levels of inorganic arsenic for a long time can cause a darkening of the skin and the appearance of small "corns" or "warts" on the palms, soles, and torso. Long-term exposure to arsenic in children may result in lower IQ scores. There is also some evidence that exposure to arsenic in the womb and early childhood may increase mortality in young adults. There is some evidence that inhaled or ingested arsenic can cause injury to pregnant women or their unborn babies. EPA has set a limit of 0.01 parts per million (ppm) for arsenic in drinking water. The Occupational

safety and Health Administration (OSHA) has set a permissible exposure limit (PEL) of 10 micrograms of arsenic per cubic meter of workplace air (10 ug/m) for 8 hour shifts and 40 hour work weeks.

37. Cobalt is a toxin, It causes skin irritation, allergic contact dermatitis, occupational asthma, and interstitial pulmonary fibrosis. Cobalt exposure may obstructive airways syndrome. It has also been reported to lead to carciomyopathy (enlarged heart), conjunctivities, testicular atrophy, and is a possible human carcinogen for lung cancer. Exposure to high levels of cobalt can result in lung and heart effects and dermatistis. Liver and kidney effects have also been observed in animals exposed to high levels of cobalt. EPA has set an average annual drinking water limit of 1000 picocurie per liter (pCi/L).

38. Other known contaminants from the Blackbird Mine Site include copper, cadmium, manganese, and/or nickel.

39. Cadmium is a pulmonary irritant and nephrotoxin. It may result in reduced lung function and emphysema. It may also result in anemia, yellow teeth discloration, rhinitis, nasal septum ulceration, osteomalacia, and possibly increased lung cancer. Breathing high levels of cadmium can severely damage the lungs. Long-terms exposure to lower levels of cadmium in air, food, or water leads to a buildup of cadmium in the kidneys and possible kidney disease. Other long-terms effects are lung damage and fragile bones. Cadmium and cadmium compounds are known human carcinogens.

40. Manganese - the most common health problems in workers exposed to high levels of manganese involve the nervous system. These health effects include behavioral changes and other nervous system effects, which include movements that may become slow and clumsy.

41. Nickel - Cancers of the lung and nasal sinus have resulted when workers breathed dust containing high levels of nickel compounds while working in nickel refineries or nickel processing plants. The Department of Health and Human Services (DHHS) has determined that nickel metal may reasonably be anticipated to be a carcinogen and that nickel compounds are known human carcinogens.

42. On or about May 22, Golder Associates, Inc., Redmond, Washington, an agent for BMSG was performing scheduled sampling of the waters of Panther Creek. The results of the testing, which showed toxic levels of contaminants in the waters of Panther Creek, were received by the, Remedial Project Manager of the Environmental Protection Agency, in June 2008, but the Plaintiffs were not notified of the testing until July 31, 2008.

43. Brett and Misty Andersen resided at, and performed their duties as managers at the Panther Creek Inn property. Their 18-month-old son, B. A., played in the mud of Panther Creek, completely unaware of the risk of heavy metal contamination in the soils and sediment that had washed down with the spring runoff. Subsequent testing in July showed a substantial amount of contamination still remained on the soils of Panther Creek Inn from previous years' contamination. It was also in July 2008, that Golder and the Idaho Department of Environmental Quality tested for the first time, for heavy metal contamination, the sediments on the banks of Panther Creek, on the property of the Panther Creek Inn.

44. On or about July 31, 2008, an agent from Golder was at the Panther Creek Inn property and asked if he could do some testing within the Panther Creek Inn. Misty Andersen gave permission. When the test results were produced, the results showed arsenic at six times higher than the acceptable levels. These claimants realized, for the first time, that human lives, particularly those of Brett, Misty and B.A., were at risk.

45. These test results also showed toxic levels of contamination in concentrations exceeding maximum concentrations allowable as established by the United States Environmental Protection Agency, and/or the Agency for Toxic Substances and Disease Registry..

46. On August 1st, at the trailer court of the Panther Creek, the same agent from Golder, requested permission to test a patron's trailer. The testing also proved "hot" for contaminants.

47. In the latter months of 2008 and early 2009, the United States Environmental Protection Agency and Defendants undertook additional testing of the Panther Creek Inn, the cabin in which Plaintiffs resided, and other buildings, to determine whether heavy metal contamination was present within the living quarters of the Inn.

48. The testing proved positive for toxic levels of contaminants within the living quarters in which Plaintiffs resided, worked, ate and slept and where 18-month-old B.A. played. Unacceptable levels of contaminants were found in furniture, rugs, bedding, clothing and in B.A.'s toys.

49. Upon finding the toxic levels of contaminants, BMSG, or their agents removed rugs and furniture from the Panther Creek Inn that tested positive for contaminants. When asked to return th rugs, so that Johansens could preserve them, BMSG refused to return them to the Johansens, or to make them available for evidentiary purposes.

50. BMSG undertook to clear the contamination from the Panther Creek Inn, the cabins and surrounding buildings. However, the "certified" HAZMAT crew sent to the cleaning was composed, at least in part, by college students trained only hours before to participate in the cleaning.

51. BMSG's efforts to clean the interior of the Panther Creek Inn left substantial and toxic levels of contaminants on shelves, ledges, in ventilation, refrigerator fans, cooler fans, and other areas that would continue to circulate and expose the Plaintiffs to the heavy metal contaminants in the Inn. Plaintiffs had no choice other than to close the Inn or complete the cleaning themselves, thus further exposing themselves to the hazardous toxins.

52. Rugs removed from the Inn were shaken into the snow directly in front of the Inn where those who entered the Inn would track the contaminants back into the Inn.

53. In the latter months of 2008 or the early months of 2009 the EPA and BMSG undertook to test the water supply to the Panther Creek Inn. This well water supply, which Plaintiffs used for drinking, bathing, cooking, showering, and in which B.A. played, was found laden with contaminants including, but not limited to, nearly nine times the acceptable levels of cobalt.

54. As a direct and proximate result of BMSG's actions and omissions, Plaintiffs lived, slept, breathed, recreated, worked and played in buildings, and on lands in streams suffused with cobalt, arsenic and other toxic substances, and have ingested, inhaled and absorbed one or more or all of the hazardous contaminants arsenic, cobalt, copper, cadmium, manganese, and/or nickel.

55. Plaintiffs' exposure to the contaminants caused by the Defendants' negligence is significantly greater than normal levels of exposure to other persons, posing an unacceptable health risk and exceeding governmentally established standards for human safety.

56. The known toxins to which Plaintiffs have been exposed are hazardous substances.

57. As a proximate result of the exposure, Plaintiffs have a significantly increased risk of contracting one or more serious latent diseases or deleterious health consequences.

58. Plaintiff Tom Johansen has already been diagnosed with obstructive lung disease, lesions on his back, and a cardiac condition of severe recalcitrant hypertension, all linked to prolonged exposure to cadmium, cobalt and arsenic.

59. Acceptance medical procedures exist that make possible the early detection and treatment of such diseases or health consequences.

60. Such monitoring regime is recommended by one or more medical professionals for one or more or all of the Plaintiffs.

61. The prescribed monitoring regime is different from that normally recommended in the absence of such exposure.

62. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principals.

63. In order to avoid the risk of latent disease, or deleterious health risks, Plaintiffs ought to comply with the medical monitoring procedures to monitor for the risks, which if undertaken by Plaintiffs will result in substantial costs to Plaintiffs at an amount to be determined at trial but in excess of $75,000.00.

64. Plaintiffs have been exposed to toxicologic, mutagenic, and /or carcinogenic chemicals or substances as a proximate consequence of BMSG's wrongful conduct or strict liability. Defendants are legally responsible for Plaintiffs exposure to the disease causing agents or substances.

65. Plaintiffs are currently suffering or have suffered from emotional distress associated with the fear of contracting a future disease or health risks.

66. The fear was proximately caused by exposure to a disease causing agent or substance; and Plaintiffs fear contracting disease or other health risks from the exposure is reasonable.

## CAUSES OF ACTION
## COUNT ONE: NEGLIGENCE
### (Against All Defendants)

67. Plaintiffs reallege and incorporate paragraphs 1 through 63 supra of this complaint as if fully set forth here.

68. Defendants owed a duty to plaintiffs to exercise reasonable care in containing, managing, transporting, treating, removing, and / or preventing the diffusion of hazardous contaminants from the Blackbird Mine Site onto the properties of the Panther Creek Inn, or into its soils, water sources and dwellings.

69. Defendants, jointly and severally, failed to exercise reasonable care in containing, managing, transporting, treating, removing, and /or preventing the diffusion of hazardous contaminants from the Blackbird Mine Site onto the properties of the Panther Creek Inn, or into its water soils, water sources, dwellings and other inhabited structures.

70. As a proximate result of defendants' negligence, plaintiffs have suffered from, and currently suffer a significantly increased risk of contracting, serious latent disease or adverse health consequences.

71. The increased risk of contracting a serious latent disease, adverse health consequences or other future harm makes periodic medical examinations reasonably necessary because monitoring and testing procedures exist which make the early detection and treatment of the known health risks both possible and beneficial.

72. As a proximate result of defendants' negligence, plaintiffs have incurred personal damages, including, but not limited to, medical costs already incurred, and future health costs and health risks, and the necessity for periodic health examination and monitoring to prevent the onset of toxin or contaminant related illness or deleterious health consequences, the cost of which is to be determined at trial, but which cost will exceed at least, $75,000.00, for which Defendants are jointly and severally liable.

## COUNT TWO: NEGLIGENCE PER SEE
### (Against All Defendants)

73. Plaintiffs reallege and incorporate paragraphs 1 through 69 supra of this complaint as if fully set forth here.

74. Defendants have unlawfully acted or omitted to perform a duty which acts or omissions have injured or endangered the health or safety of Plaintiffs in violation of one or more Idaho Statutes including, but not limited to, Idaho Code § 39-4401, et seq.

75. Defendants unlawful acts or omissions violate one or more federal laws including but not limited to 42 USC § 9601, et seq.

76. Defendants are jointly and severally liable to Plaintiffs for their acts or omissions.

77. As a proximate result of defendants' negligence per se, plaintiffs have incurred personal damages, including, but not limited to, medical costs already incurred, and future health costs and health risks, and the necessity for periodic health examination and monitoring to prevent the onset of toxin or contaminant related illness or deleterious health consequences, the cost of which is to be determined at trial, but which cost will exceed at least, $75,000.00, for which Defendants are jointly and severally liable.

## COUNT THREE: TRESPASS
### (Against All Defendants)

78. Plaintiffs reallege and incorporate paragraphs 1 through 74 supra of this complaint as if fully set forth here.

79. Through improper methods of containing, managing, transporting, treating, removing, and /or preventing the diffusion of hazardous contaminants from the Blackbird Mine Site, Defendants have released hazardous substances into the groundwater, the soils, the air, dwellings and other inhabited structures of the Panther Creek Inn, thereby significantly exposing Plaintiffs to known hazardous substances.

80. These hazardous substances have been released from the Site into the soil, groundwater and surface water.

81. The past and present disposal and migration of hazardous substances from the Site are a "release" as defined in section 101(22) of CERCLA, 42 U.S.C. §9 9601(22).

82. The potential for future migration of hazardous substances from the Site poses a threat of a "release" as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

83. The release of one or more hazardous substances from the facility may present an imminent and substantial endangerment to the public health, welfare, or the environment.

84. Such releasing of hazardous substances constitutes trespass.

85. As a proximate result of defendants' trespass, plaintiffs have suffered and currently suffer a significantly increased risk of contracting a serious latent disease or other adverse health consequences.

86. The increased risk of contracting a serious latent disease, adverse health consequences or other future harm makes periodic medical examinations reasonably necessary because monitoring and testing procedures exist which make the early detection and treatment of the known health risks both possible and beneficial.

87. As a proximate result of defendants' trespass, plaintiffs have incurred personal damages, including, but not limited to, medical costs already incurred, and future health costs and health risks, and the necessity for periodic health examination and monitoring to prevent the onset of toxin or contaminant related illness or deleterious health consequences, the cost of which is to be determined at trial, but which cost will exceed at least, $75,000.00, for which Defendants are jointly and severally liable.

## COUNT THREE: STRICT LIABILITY
### (Against All Defendants)

88. Plaintiffs reallege and incorporate paragraphs 1 through 84 supra of this complaint as if fully set forth here.

89. In transporting, treating, removing and clean-up of hazardous contaminants from the Blackbird Mine Site defendants jointly and severally were engaged in an abnormally dangerous activity.

90. Defendants are jointly and severally liable to Plaintiffs for damages sustained as a result of Defendant's abnormally dangerous activity.

91. As a proximate result of Defendant's abnormally dangerous activity, plaintiffs have incurred personal damages, including, but not limited to, medical costs already incurred, and future

health costs and health risks, and the necessity for periodic health examination and monitoring to prevent the onset of toxin or contaminant related illness or deleterious health consequences, the amount of which is to be determined at trial, which amount will exceed at least, $75,000.00, for which Defendants are jointly and severally liable.

### COUNT FOUR: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND INJURY
### (Against All Defendants)

92. Plaintiffs reallege and incorporate paragraphs 1 through 88 <u>supra</u> of this complaint as if fully set forth here.

93. Defendants' joint and several activities have inflicted mental and emotional distress on plaintiffs.

94. The infliction of mental and emotional distress and injury was a direct and foreseeable consequence of defendants' actions.

95. Defendants acted negligently in that they knew, or in the exercise of reasonable care, should have known, that their actions that led to the contamination of the Panther Creek Inn, its residences and buildings, its soil and water, as well as Defendants' omissions and deficiencies in cleanup, would give Plaintiffs exposure to toxic substances above maximum allowable concentrations established by the governmental entities with regulatory authority, and would give rise to reasonable fear and apprehension of the deleterious health consequences of such exposure, but Defendants took inadequate action to prevent this.

96. As a direct and proximate consequence Plaintiffs have suffered personal injury, mental and emotional grief, worry, and stress in an amount of general damages to be shown at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the following relief jointly and severally against Defendants:

1. An award to Plaintiffs for their medical costs incurred to date to assess their current medical conditions, as a direct consequence of having been informed of exposure to the contaminants as alleged in this complaint.

2. An award to Plaintiffs for their future medical costs to be incurred, for periodic health examination and monitoring to prevent the onset of toxin or contaminant related illness or

deleterious health consequences, the amount of which is to be determined at trial, but which amount exceeds at least, $75,000.00.

3. Compensatory and general damages for Plaintiffs' personal injuries.

4. An award to Plaintiffs of their costs, expenses and attorney's fees; and

5. Such other relief as the interests of justice or equity require.

Dated this 3rd day of January, 2011.

MERRILL AND MERRILL, CHARTERED

By: /s/ Kent A. Higgins

## REAFFIRMATION OF DEMAND FOR JURY TRIAL

Plaintiffs hereby reaffirm their demand for a trial by jury on all issues so triable.

Dated this 3rd day of January, 2011.

MERRILL AND MERRILL, CHARTERED

By: /s/ Kent A. Higgins